# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

ARTHEA GRACE                                                                                                    PLAINTIFF

V.                                                            CAUSE NO. 3:16-CV-432-CWR-LRA

CENTERPOINT ENERGY, INC.                                               DEFENDANTS
AND JOHN DOES 1-5

## ORDER

In 2004, CenterPoint Energy, Inc. hired Arthea Grace as a service technician.[1] In 2015, CenterPoint fired Grace on the grounds that she violated a company rule by having "falsified company records."[2] Grace has disputed this justification, claiming that CenterPoint actually fired her because she is a black woman.[3] Grace brought a Title VII employment discrimination claim to remedy this alleged wrong.[4] At the conclusion of discovery, CenterPoint moved for summary judgment.[5] For the reasons stated below, that motion is DENIED.

### I. Background

The analysis for a Title VII discrimination claim is straightforward. First, Grace must establish a *prima facie* case that her firing was motivated by "a protected factor."[6] If Grace establishes this case, then the burden shifts to CenterPoint to produce evidence that Grace's firing was based on a "legitimate nondiscriminatory reason."[7] If CenterPoint meets this burden, then Grace must prove that this reason was merely "a pretext for discrimination."[8]

---

[1] Docket No. 22-2 at 2.
[2] *Id*.
[3] Docket No. 2 at 3.
[4] *See, generally, id*.
[5] Docket No. 22.
[6] *Green v. Armstrong Rubber Co*., 612 F.2d 967, 968 (5th Cir. 1980) (citation omitted).
[7] *Id.*
[8] *Id.*

CenterPoint's motion for summary judgment makes only one argument: that Grace has failed to establish her *prima facie* case.[9] That motion does not argue that CenterPoint has produced evidence showing that Grace's firing was based on a legitimate nondiscriminatory reason. Nor does it argue that Grace has failed to prove that reason was a pretext for discrimination. This Court's only duty, then, is to determine if CenterPoint has shown there is no "genuine dispute" of any "material fact" as to whether Grace has established her *prima facie* case.[10]

**II.     Has Grace Established Her *Prima Facie* Case?**

In a work-rule violation case like this one, Grace can establish her *prima facie* case in two ways.[11] First, Grace can show that she "did not violate" the relevant rule.[12] Second, if Grace did violate that rule, she must show that "similarly situated" employees not in the protected class "were not punished similarly."[13] The discussion below assesses if Grace has made either showing.

**A.  Did Grace Violate The Relevant Rule?**

CenterPoint argues that Grace indisputably violated the relevant rule – that is, the rule that CenterPoint fired her for breaking. In its briefings, CenterPoint suggests that Grace was fired for a host of rule violations, including a "failure to perform a gas leak investigation" and "expos[ing] CenterPoint's customer, a pregnant woman, to potential injury or death."[14] But CenterPoint's own exhibits indicate that the company justified Grace's firing on a single ground: falsifying company

---

[9] Docket No. 22 at 1 ("Grace's Title VII claims fail because she cannot establish a prima facie case of discrimination").
[10] Fed.R.Civ.P. 56(a).
[11] *Mayberry v. Vought Aircraft Co*., 55 F.3d 1086, 1089 (5th Cir. 1995).
[12] *Id*.
[13] *Id*.
[14] Docket No. 22 at 1; *see also* Docket No. 22-1 at 78 (CenterPoint exhibit suggesting that Grace violated company policies regarding technicians should do when they cannot access a building).

2

documents.[15] Grace allegedly violated a rule banning such falsification in March 2015 when she submitted documents to CenterPoint to resolve a report of a gas leak.[16]

Grace states that she did not falsify any company documents. To support her claim, she has given highly detailed testimony regarding what occurred during the relevant leak investigation. That testimony is as follows.[17]

In the early hours of March 31, 2015, a CenterPoint dispatcher tasked Grace with investigating a reported gas leak. Grace knew the reported leak was located in a gated community, and asked the dispatcher for the gate code. The dispatcher informed her that he did not have the code because CenterPoint's "computers were down" – a claim verified by internal records submitted to this Court by CenterPoint.[18] The dispatcher told Grace to drive to the leak without a gate code, and that he would "see what [he could] do" to get her past the locked gate.

Upon arrival at the gated community, Grace spent half an hour attempting to get beyond the locked gate. During this time, the dispatcher suggested the leak report was "old" and "left over" in the system, and "probably wasn't a leak" because a prior CenterPoint technician had "probably" turned off the gas at the residence. The dispatcher "question[ed] the validity" of the leak report, saying it was "probably an error." Grace concluded that there was not an active leak at the location. She left the entrance of the gated community an hour after being tasked with the leak report, and returned home to take care of her sick children.

CenterPoint requires technicians to resolve leak reports by entering one of three options into their computer system: no leak found, leak found, or leak repaired. About three hours after

---

[15] *See, e.g.,* Docket No. 22-2 at 1 (CenterPoint human resources officer stating that the company fired Grace because she "had fabricated company documents"); Docket. No. 22-1 at 8 (Grace testifying that "the reason CenterPoint gave [her] for [her] termination" was "falsifying documents and not following company policy" by doing so).
[16] *Id.*
[17] This testimony and all relevant quotations cited below are located in the copy of Grace's complete deposition submitted to this Court by CenterPoint. Docket No. 22-1 at 10-16.
[18] Docket No. 22-1 at 69.

leaving the entrance to the gated community,[19] Grace entered "no leak found" into CenterPoint's computer system, along with the notation that she "didn't have any access" to the location of the reported leak. CenterPoint's own exhibits verify that Grace resolved the leak report by entering "NLF [no leak found] . . . gated community . . . no access" into their computer system.[20]

CenterPoint does not dispute Grace's story. Instead, they argue that Grace's entry amounts to falsifying a company document. This argument assumes that CenterPoint had a rule that technicians could enter "no leak found" only under certain circumstances, and that such circumstances were not present when Grace her entry.

This assumption finds no support in the record. Perhaps CenterPoint had a rule that "no leak found" could be entered only after physically examining a gas line, something Grace failed to do. But no evidence has been submitted that indicates what, if any, rules were in place in March 2015 regarding the entry of "no leak found." The record's silence on the existence of any rule requires this Court to assume that there was *no* rule about when "no leak found" could be entered.

On this assumption, Grace may not have lied when she made her entry into CenterPoint's computer system. This conclusion is not changed by Grace's subsequent statement, when confronted by management, that she "kind of dropped the ball" by failing to turn off the gas line upstream of the site of the reported leak.[21] This statement may be an admission that Grace violated a company policy dictating how technicians must act when they cannot access the site of a reported leak.[22] It is not, however, an admission that that she violated CenterPoint's ban on falsifying company documents. This is because Grace's entry did not include a claim that she followed every

---

[19] Grace's testimony is unclear as to when she made this entry, but an email she wrote in April 2015 states that this call occurred shortly after 6:24 A.M. Docket No. 22-5.
[20] *Id.*
[21] Docket No. 22-1 at 67 (Grace admitting that she "should have investigated the leak [and] locked it off if nobody was home . . . I kind of dropped the ball on this one").
[22] *Id.* at 77 (CenterPoint policy regarding no-access situations).

4

company policy in responding to the leak. Instead, her entry appears to be an accurate statement of what happened: she did not find a leak because she could not access the reported leak location. Given all this, there is a genuine dispute as to whether Grace established her *prima facie* case by showing that she did not violate the rule against falsifying company documents.

### B. Were Male Employees Similarly Situated To Grace Not Fired?

Assuming Grace did violate CenterPoint's ban on falsifying company documents, she still may establish her *prima facie* case by showing that one or more "similarly situated" employees outside the protected class "were not punished similarly."[23] To do so, Grace must show that such employees (1) "held the same job or responsibilities," (2) "shared the same supervisor or had their employment status determined by the same person," (3) had "essentially comparable violation histories," and (4) had "nearly identical" rule violations that led to different punishments.[24]

CenterPoint argues that Grace cannot make these showings because she has provided "no evidence CenterPoint treated any *male, non-African American* employee more favorably under substantially similar circumstances."[25] CenterPoint misstates Grace's burden. In alleging both race and gender discrimination, Grace seeks the protection Title VII gives to three distinct classes of employees: black people, women, and black women.[26] To obtain that protection, she need only present evidence that CenterPoint treated her differently from employees who were outside at least one of these classes, not two or more of them.

Here, Grace has presented evidence that CenterPoint discriminated against her because she was a woman. She has not, however, presented any evidence that CenterPoint discriminated

---

[23] *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (citations and quotation marks omitted).
[24] *Id.*
[25] Docket No. 23 at 1 (emphasis added).
[26] *Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1030 (5th Cir. 1980) (holding that Title VII claims brought "on the basis of both race and sex" seek protection on the basis of "sex or race . . . and, in the alternative, sex and race").

5

against her because she was black or because she was a black woman.[27] The analysis below is limited accordingly, and will examine how CenterPoint treated "similarly situated" male technicians. That analysis is divided into four parts, each discussing whether Grace has satisfied a particular prong of the "similarly situated" test.

### 1. Did The Male Employees Have The Same Job As Grace?

The first prong requires that Grace show that "similarly situated" male employees "held the same job or responsibilities."[28] Grace has testified that two "similarly situated" employees – Lance Childers and Gelston McCornell – were, like her, CenterPoint technicians.[29] This testimony is undisputed, and thus satisfies the first prong.

### 2. Did The Male Employees And Grace Share The Same Supervisor?

The second prong requires that Grace show that she and the male employees "shared the same supervisor or had their employment status determined by the same person."[30] Grace testified that Mr. Childers and Mr. McCornell were, like herself, supervised by CenterPoint Supervisor Allen Smith.[31] This testimony is undisputed,[32] and therefore satisfies the second prong.

### 3. Did The Male Employees And Grace Share Essentially Comparable Disciplinary Records?

The third prong requires Grace to establish that she and the male employees had "essentially comparable" disciplinary records.[33] Grace has not provided evidence regarding the

---

[27] *See* Docket No. 22-1 at 137-38 (Grace testifying that she "can't think of any" instances where Supervisor Smith discriminated against black employees).
[28] *Lee*, 574 F.3d at 260.
[29] Docket No. 22-1 at 19.
[30] *Lee*, 574 F.3d at 260.
[31] Docket No. 22-1.
[32] CenterPoint argues that Grace has failed to meet this prong because she was not fired by the same person who decided to not fire Mr. Childers and Mr. McCornell. Docket No. 23 at 9-10 ("Grace cannot establish a prima facie case because Smith, who she accuses of discriminatory motives, was not the ultimate decision maker"). This argument misinterprets this prong, which can be met by showing a shared supervisor *or* a shared person who determined an employment status.
[33] *Lee*, 574 F.3d at 260.

records of Mr. Childers or Mr. McCornell. Instead, she has testified that her own record was functionally spotless, and consequently is comparable to (or better than) the records of Mr. Childers and Mr. McCornell, whatever they were.[34]

CenterPoint disputes this testimony by presenting a single piece of evidence regarding Grace's disciplinary record. That evidence, a 2007 internal memorandum from Supervisor Smith to Grace, told her she was being disciplined for three recent "serious violations" of company policy.[35] These violations were: failing to notify Supervisor Smith after evacuating a home during a leak report; entering a customer's home to investigate a gas leak without permission from Supervisor Smith; and failing to follow Supervisor Smith's instructions to return to a customer's residence.[36] Grace's signature appears at the bottom of the memorandum.[37] However, that signature is accompanied by a handwritten disclaimer: "I have signed this, [but] I do not agree to several points in this document. See my attachment."[38] The contents of this attachment are unknown, as CenterPoint did not submit it to the Court, but neither did Grace.

The tension in the 2007 memorandum between Supervisor Smith's allegations of work violations and Grace's denial of those allegations can be resolved by Grace's own testimony.[39] Grace says the memorandum was part of a gender-based harassment campaign against her, the only woman on the team of technicians supervised by the newly-appointed Supervisor Smith. That campaign consisted of, among other things, accusing Grace of fabricated or exaggerated policy violations. Grace reported this harassment to a host of CenterPoint officials, an Employee

---

[34] Docket No. 22-1 at 17-19.
[35] Docket No. 22-3. CenterPoint has also provided a 2017 declaration from CenterPoint's human resources officer which authenticates the memorandum and summarizes the information within it. Docket No. 22-2.
[36] Docket No. 22-2.
[37] Docket No. 22-3.
[38] *Id.*
[39] This portion of Grace's testimony, and all relevant quotes below, is found in the middle of her deposition. Docket No. 22 at 17-19.

Assistance Program hotline, and CenterPoint's own human resources department. A member of that department eventually met with Supervisor Smith regarding Grace's allegations. Grace says that "from that point on . . . [Supervisor Smith] backed off, let me do my job."

If Grace's testimony is to be believed, then the only infractions appearing on her disciplinary record at the time of her firing were a sham. Grace's record would therefore have been "essentially comparable" to those of Mr. Childers and Mr. McCornell. Given this testimony, there is a genuine dispute of material fact as to whether Grace has met the third prong of the "similarly situated" test.

### 4. Did The Male Employees And Grace Share Nearly Identical Rule Violations That Led To Different Punishments?

The final prong requires Grace to show that the male employees had "nearly identical" rule violations that led to different punishments. Grace testified that both Mr. Childers and Mr. McCornell were not fired despite falsifying company documents. That testimony is as follows.[40]

In 2014, Grace was called to an uninhabited house at 159 Lake Harbour Drive in Ridgeland, Mississippi to investigate a gas leak report. Upon arrival, she found a leak caused by malfunctioning equipment, which was resolved by shutting off the gas to the house (but not fixing the equipment). Later, after a family moved into the house, Mr. Childers was called to turn on gas at the residence. Mr. Childers resolved the call by submitting documentation to CenterPoint which stated that he had turned on the gas and "tested everything." In fact, Mr. Childers had failed to test the malfunctioning equipment. That failure caused a gas leak, which Grace personally resolved. Supervisor Smith was informed of Mr. Childers' wrongdoing, but Mr. Childers was never fired from CenterPoint. Mr. Childers also falsified company documents in a similar fashion while

---

[40] Grace's testimony regarding the falsification of company documents by Mr. Childers and Mr. McCornell, and all relevant quotations below, are located in the middle of her deposition. Docket No. 22 at 19-22.

responding to a gas leak report in 2015. Once again, despite Grace reporting Mr. Childers' wrongdoing, Mr. Childers was not fired.

Mr. McCornell falsified company documents while responding to a gas leak report at 110 Twin Cedars in Florence, Mississippi in 2014. After resolving the report, he submitted documentation to CenterPoint stating that he had conducted a series of gas leak tests and had re-lit a gas stove and single water heater. The customer who submitted the report called CenterPoint the next day to report another gas leak. Grace responded to the new report, and was told by the customer that Mr. McCornell had not completed the necessary testing during the initial visit. Grace verified this complaint, because – contrary to the documents submitted to CenterPoint by Mr. McCornell – the customer's house had an electric stove (as opposed to a gas stove) and two water heaters (as opposed to one). Mr. McCornell's failure to re-light the second water heater also indicated that he had not performed the proper gas leak tests. Grace reported Mr. McCornell's wrongdoing to Supervisor Smith, but Mr. McCornell was never fired.

CenterPoint has presented no evidence that disputes Grace's testimony on these points.[41] Instead, CenterPoint argues that the violations Grace describes were not "nearly identical" to those she allegedly committed. CenterPoint claims that Mr. Childers and Mr. McCornell only "negligent[ly]" falsified company documents, while Grace did so "intentional[ly]" and consequently put a customer "at serious risk of injury or death."[42]

This argument is beside the point. The rule Grace allegedly violated was not a ban on falsifying company documents *intentionally*, nor was it a ban on falsifying company documents *in a way that could put customers at serious risk of injury of death*. It was a ban on falsifying company

---

[41] CenterPoint merely argues that the misconduct of Mr. Childers and Mr. McCornell amounted to "work performance issues" that did not constitute "lie[s]." Docket No. 23 at 8-9. This argument is conclusory and unpersuasive.
[42] Docket No. 22 at 7.

9

documents, period. Grace's testimony establishes a genuine dispute of material fact as to whether she met the fourth and final prong of the "similarly situated" test by showing that the male employees violated a "nearly identical" company rule.

In sum, even if Grace violated CenterPoint's ban on falsifying company documents, there is a genuine dispute as to whether she established her *prima facie* case by showing that similarly situated male employees were not punished similarly.

### III. Conclusion

CenterPoint's motion for summary judgment is narrowly focused on Grace's alleged failure to establish a *prima facie* case of employment discrimination. The record shows there to be genuine disputes of material fact as to whether Grace has established that case in regards to gender-based discrimination. CenterPoint has consequently failed to meet their burden, and their motion must be DENIED.

**SO ORDERED,** this the 16th day of October, 2017.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE